Larry ISRAEL, Plaintiff,

v.

SONIC–MONTGOMERY FLM, INC.,
d/b/a Friendly Ford Lincoln
Mercury, Defendant.

No. CIV.A. 01T1358N.

United States District Court,
M.D. Alabama,
Northern Division.

Nov. 13, 2002.

McPhillips, Shinbaum & Gill, Montgomery, AL, for Larry Israel, plaintiff.

Benjamin Collier Wilson, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, Stacy K. Wood, Parker, Poe, Adams & Bernstein, L.L.P., Charlotte, NC, for Sonic Corporation, Sonic–Montgomery, FLM, Inc., dba Friendly Ford Lincoln Mercury, defendants.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Larry Israel filed this lawsuit, charging that defendant Sonic–Montgomery FLM, Inc., d/b/a Friendly Ford Lincoln Mercury, fired him on the basis of his age in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. §§ 621–634, and the Alabama Age Discrimination in Employment Act of 1997 (AADEA), 1975 Ala.Code §§ 25–1–20 through 25–1–29. Jurisdiction of Israel's ADEA claim is proper under 42 U.S.C.A. §§ 1331 (federal question) and 1343 (civil rights) and 29 U.S.C.A. § 626 (ADEA); jurisdiction over his supplemental state-law AADEA claim is proper under 28 U.S.C.A. § 1367. This lawsuit is currently before the court on Sonic's motion for summary judgment. For the reasons that follow, the motion is denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the

Julian L. McPhillips, Jr., Kenneth Jay Shinbaum, Karen Sampson Rodgers,

motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of the pleadings. Fed.R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

From 1980 until December 1, 1995, Israel worked for Blount Strange Automotive Group at their Cobb Pontiac–Cadillac facility as a Finance and Insurance ("F & I") Manager. The F & I Department generates income after cars are sold at the dealership, by financing the deals and by selling "after market" products, such as vehicle service contracts and accident and health insurance.

On December 1, 1995, Israel was transferred to Friendly Ford, also owned by Blount Strange, and became the Lead F & I Manager there. At Friendly Ford, Israel retained his previous duties, and also became responsible for supervising two other F & I employees and an administrative assistant. Israel also performed additional administrative tasks, and became involved in all transactions that were having trouble getting financed. Because Friendly Ford did more sales volume than did the Cobb dealership, this transfer was viewed as a promotion by Israel. He reported directly to Tim Nix, the general manager at Friendly Ford.

The main figure used to evaluate the performance of the F & I Department at Friendly Ford is the 'per vehicle retail' or, as it is known in the trade, the 'PVR.' The PVR is calculated by taking the total monthly income generated by the F & I Department and dividing it by the number of cars sold in that month.

On July 27, 1999, pursuant to Israel's semi-annual review, Nix wrote a memo to Israel complaining about his performance. In this memo, Nix told Israel that the PVR at Friendly Ford was unsatisfactory, and that it was off by $219,200 for the first six months of the year. Additionally, although Nix acknowledged that external circumstances explained some of this decline, he stated that in comparison to other dealers in Friendly Ford's peer group, the average PVR at Friendly Ford for new cars was over $100 less ($210 compared to $312), and for used cars approximately $70 less ($372 compared to $439). Nix concluded the memo by stating that Friendly Ford could not lose this amount of money, and that the members of the F & I group must be motivated to "at least average performance" or replacements would occur. After this July 1999 letter, Nix and Israel discussed Friendly Ford's PVR at least once a month during manager meetings. The PVR of the F & I Department remained a cause of concern for Nix, and he continually talked to Israel about improving the figure.

In December 1999, Sonic began discussions with Blount Strange to buy the Friendly Ford dealership. At this time,

the National F & I Director of Sonic visited Friendly Ford and met with the members of the F & I Department. The National F & I Director met with Israel and another F & I employee together. At the end of the meeting, Israel mentioned to the National F & I Director that he had been doing F & I for over 19 years. The director responded to this by stating, in essence, "I think you might be too old to change." This comment was heard by both Israel and the other F & I employee, although neither responded to it.

On March 1, 2000, Sonic bought Friendly Ford and continued to operate it in the same manner as had Blount Strange. At this time, however, the Regional F & I Director stated that Friendly Ford's F & I Department could be generating as much as $800 PVR and was performing poorly. Pursuant to this conversation, Nix told Israel and Lisa Adams, another F & I employee, that, if they did not increase their PVRs, Nix would be required to fire them. Additionally, Nix told the Regional Director to begin looking for replacements in anticipation of restaffing the department. About a week after this meeting, Nix wrote a memo to two Sonic executives and memorialized the conversation Nix had had with Israel about increasing Friendly Ford's numbers and the threat of replacement.

On March 30, 2000, Sonic decided to terminate Nix. Paul Lezon, the Regional Vice President of Sonic, and two other members of Sonic's management, both of whom had received the memo Nix had written regarding the F & I Department, came to Friendly Ford to terminate Nix. After terminating Nix, Lezon met with Jerry Thrash, the General Sales Manager, to discuss the management of Friendly Ford. After this meeting, Thrash met with Israel and terminated his employment.

Sonic contends that none of its management employees made the decision to terminate Israel; that, instead, Thrash told Lezon he believed Israel should be terminated; and that Lezon gave Thrash the authority to do so. Israel contends that Thrash was told to terminate Israel by Sonic. This factual dispute will be discussed below.

## III. DISCUSSION

### A.

In support of its motion for summary judgment, Sonic argues that Israel has failed to establish a prima-facie case under the ADEA. In the alternative, it argues that, even if Israel has satisfied the elements of a prima-facie case, he has failed to rebut Sonic's legitimate, nondiscriminatory justifications for its employment decision.

The ADEA prohibits an employer from failing or refusing to hire any individual or otherwise discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's age; the protected class under the ADEA includes individuals over the age of 40. 29 U.S.C.A. § 621(a)(1). An employee bringing a claim under the ADEA must prove intentional discrimination by the employer through one of two methods: presenting direct evidence of discriminatory intent, or presenting circumstantial evidence of discrimination by satisfying the four-pronged analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because Israel has not presented any direct evidence to support his claim of discrimination, the court will only address his circumstantial evidence of age discrimination.

To establish an ADEA claim by using circumstantial evidence, the employee has the initial burden of showing by a preponderance of the evidence that a prima-facie case of discrimination exists. *Young v.*

*General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988). The essence of the prima-facie case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the factfinder that the employer used prohibited criteria in making an adverse decision about the employee. The elements of a prima-facie case of discrimination under the ADEA will vary depending on what theory the employee uses to prove his case. *See, e.g., Benson v. Tocco,* 113 F.3d 1203, 1208 (11th Cir.1997) (listing elements of prima-facie case for reduction in force claim); *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989) (listing elements of a prima-facie case for termination and failure to hire claims). If established, the prima-facie case raises a presumption that the employer is liable to the employee under the ADEA. *Texas Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Once the employee has established a prima-facie case of discrimination, the employer must articulate legitimate, nondiscriminatory reasons for its employment decision. At this point, the employer's burden "is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons." *Chapman v. AI Transport,* 229 F.3d 1012 (11th Cir.2000) (internal citations omitted). Once the employer has come forward with a nondiscriminatory reason for its actions, the "presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman,* 229 F.3d at 1024 (quotation omitted). The employee may meet this burden by persuading the court either directly by showing that a discriminatory reason more than likely motivated the employer or indirectly by showing that the proffered reason for the employment decision is not worthy of belief. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see also Young,* 840 F.2d at 828.

■ As stated above, the prima-facie case of discrimination under the ADEA will differ somewhat given the nature of the adverse action alleged. The prima-facie case for a general discriminatory discharge case requires Israel to prove that he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual. *Chapman,* 229 F.3d at 1024. As to the fourth element, Israel can also demonstrate that Sonic "retained younger managers despite problems with their work" to give "rise to such an inference of age discrimination." *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493 (11th Cir.1987).

There is no dispute as to the first three elements of Israel's prima-facie case. Israel was born on July 22, 1941, was 58 in March 2000, and, therefore, falls within the ADEA's protected class. Israel's employment was terminated, which obviously qualifies as an adverse employment action, and the court will presume he was qualified to do his job, given he had been in the F & I Department for 20 years, and in this particular job for five years. *See, e.g., Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir.2001) (stating qualification for the particular job is assumed when an employee has been in position for a significant period of time). Therefore, the court will focus on the last element of Israel's prima-facie case.

■ Israel argues that he has satisfied the fourth element of his prima-facie case under three different theories. First, he contends that Lisa Adams, a younger

member of the F & I Department, had been given the same performance warnings as he had and was not fired. Nix also warned Adams, who was 36 at the time Sonic acquired Friendly Ford, that if her numbers did not increase she would be replaced. Israel contends that Sonic's decision to fire him and keep her is evidence of discrimination, as it demonstrates that a younger employee with similar problems was retained when he was fired. However, Adams was merely an employee of the F & I Department, not the Lead F & I person as Israel was. This difference in their jobs negates Israels' contention that they were similarly situated employees, and, therefore, Sonic's retention of her cannot be used as evidence of discrimination against Israel. *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (stating that similarly situated employees must be similar in all respects); *Anderson v. Twitchell–A Tyco Int'l,* 76 F.Supp.2d 1279, 1286 (M.D.Ala.1999) (DeMent, J.) (same).

■ Second, Israel argues that he has satisfied the fourth element of his prima-facie case by proving that he was qualified to be in the F & I Department, even if not in the position of Lead F & I Manager. Israel is attempting to show that another job for which he was qualified existed when he was fired; therefore, firing him instead of reassigning him is evidence of Sonic's discrimination against him. However, this method of establishing a prima-facie case is pertinent to reduction in force cases, not termination cases. *Allison v. W. Union Tele. Co.,* 680 F.2d 1318, 1321 (11th Cir.1982) (expressly accepting that in reduction of force cases, discrimination can be inferred when an employee is fired instead of demoted to a job for which they were qualified). Therefore, it does not satisfy the fourth element of Israel's prima-facie case.

■ Finally, Israel claims that he was replaced by a younger employee. In his deposition, Sonic's Regional F & I Director stated that, based on the volume of sales at the dealership, three employees were needed in the F & I Department. After Israel's termination only two employees remained, and Tim Youngblood, who already worked at Friendly Ford in a different finance position, was transferred to the F & I Department, but not as the "Lead" F & I Manager. Youngblood was in his mid–40s at the time. Then in mid or late 2001, John Eddie Lowe became the Lead F & I Manager. Lowe was in his early 30s.

Israel contends that Lowe was his replacement, and, because Lowe was significantly younger than he, he has established his prima-facie case of discrimination. Sonic contends that no one replaced Israel as the Lead F & I Manager after he was terminated, and therefore, Israel cannot demonstrate that he was replaced by someone outside his class. Alternatively, Sonic contends that Lowe became Lead F & I Manager over a year after Israel was fired, and, therefore, because of the considerable time lag, replacing Israel with him cannot raise an inference of discrimination.

In *Watkins v. Sverdrup,* 153 F.3d 1308, 1315–16 (11th Cir.1998), the Eleventh Circuit held that, in ADEA claims involving a reduction of workforce, plaintiffs could not base a prima-facie case on the fact that, after the lay-offs, other employees were hired with the same job title as the laid-off plaintiffs. Instead, the plaintiffs were required to demonstrate that the new employees possessed similar skills to those they possessed and were hired to perform the same tasks, regardless of their job title. Job labels, while instructive, are not determinative; it is job content that matters.

The same analysis applies to this case. To determine whether Youngblood was Israel's replacement depends on whether the tasks that set the Lead F & I Manager position apart from the other employees in the department were performed by Youngblood or remained unfulfilled until Lowe was hired. The court has no evidence on this issue, and will therefore resolve this dispute in the manner most favorable to Israel, the non-moving party in this case. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Therefore, the court assumes that Israel, Youngblood, and Lowe performed the same job, and that, because Youngblood was the first employee hired into the F & I Department after Israel was fired, Youngblood replaced Israel.

Ironically, Israel contends that Lowe was his replacement, when, as the court will now explain, such a finding would preclude this court from holding that Israel has met his prima-facie case. Lowe was hired into the Lead F & I position at least a year after Israel was terminated. This significant time lag between the termination of Israel's employment and the decision to give Lowe the Lead F & I position makes Israel's replacement by a younger individual less indicative that age was a consideration and, therefore, less supportive of a prima-facie case of age discrimination. *See, e.g., Howard v. Roadway Exp., Inc.* 726 F.2d 1529, 1535 (11th Cir.1984) (stating that "the lapse of eleven months would significantly diminish the reliability of the subsequent hiring as an indicator of [employer's intent] at the time it rejected" the plaintiff).

Sonic contends that no one replaced Israel, and because Youngblood was the first employee hired into the F & I Department, his age precludes the court from finding Israel has met his prima facie case. Ironically, using Youngblood as Israel's replacement would allow this court to hold that Israel has met his prima-facie case. Youngblood, who was in his mid–40s, was transferred to the F & I Department after Israel was terminated. Israel was 58 at this time, and although Youngblood was in the age group protected by the ADEA, this does not preclude a finding that his replacement of Israel satisfies the fourth element of the prima-facie case. *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (holding that prove a prima-facie case, the employee is not necessarily required to show that the replacement was younger than 40); *Wright v. Southland Corp.,* 187 F.3d 1287, 1291 (11th Cir.1999). Therefore, Israel has proven the elements of a prima-facie case of discrimination.

■ In order to meet its burden of production, Sonic offers two reasons for firing Israel. Sonic claims Israel was fired, first, because of his poor performance and, second, because Thrash suggested it. Because both reasons are nondiscriminatory, Sonic has met its burden of production and Israel must now come forward with evidence that these reasons are a pretext for intentional age discrimination. Israel can demonstrate this by providing direct proof of discrimination or by showing that Sonic did not rely on either of the proffered reasons. *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (quotation omitted).

Sonic's first reason is supported by two pieces of documentary evidence. First, Sonic offers Nix's memo appraising Israel's performance in 1999, which focused on the unsatisfactory numbers of the F & I Department in general, and on Nix's desire to improve these numbers, or replace managers at the office. The second piece of documentary evidence is the memo written by Nix on March 9, 2000, to the management of Sonic. In this memo Nix

memorialized a conversation he had with Israel, in which he again told Israel that his numbers needed to be increased or he would be replaced. Sonic also points to the difference in PVR between Friendly Ford and the other dealerships mentioned in Nix's memo.

Israel does not dispute this evidence, but disputes whether his poor performance was the actual reason he was fired. He first notes that another employee in the F & I Department was also warned about her numbers but was not fired. Second, he points out that Sonic did not even give him a month to increase his PVR numbers, and fired him only 21 days after learning of his poor performance from Nix. Finally, and most importantly, he points to the depositions and affidavits of each member of Sonic's management staff present at the dealership when Israel was fired. Each affidavit explicitly states that no one in the management team had talked about firing Israel for his poor performance or for any reason and that, to their knowledge, the only reason that Israel's employment was terminated was because Thrash suggested it. The court concludes that, while Israel's poor job performance was documented, the evidence proffered by both sides illustrates that Sonic's management had not yet discussed whether to fire Israel because of his performance, and that this tendered reason was "not the real reason[ ] for the adverse employment decision." *Chapman*, 229 F.3d 1012.

■ The second reason Sonic gives for terminating Israel's employment is that Jerry Thrash, the General Sales Manager of the dealership suggested it. In Lezon's affidavit he states that, after firing Nix, he met with Thrash, who informed him he believed that firing Israel would increase the PVR of the dealership because Israel's "performance and attitude were not conducive to a positive working atmosphere." Lezon states that he then told Thrash that

Thrash had the authority to fire Israel, and Thrash did so.

To rebut this, Israel offers Thrash's affidavit from August 2002, in which he states that in the conversation he had with Lezon he was told to fire Israel and that at no time did he suggest that Israel should be fired. Sonic suggests that this affidavit is insufficient as a matter of law to create an issue of fact for the jury, because Thrash has made prior statements, namely in a February 2001 affidavit and in a separate court complaint filed by Thrash in March 2002, contradicting this affidavit. Thus, Sonic points to three statements by Thrash: (1) the February 2001 affidavit; (2) the statement in the March 2002 complaint; and (3) the August 2002 affidavit. Sonic relies on *Van T. Junkins & Assoc., Inc. v. U.S. Indus.*, 736 F.2d 656, 658–59 (11th Cir.1984), to argue that, because the August 2002 affidavit contradicts prior statements, it cannot be used to create an issue of material fact in these summary-judgment proceedings.

In *Van T. Junkins*, the Eleventh Circuit affirmed a grant of summary judgment, holding that a district court may properly find that a party's contradictory affidavit is a sham. The appellate court explained: "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." 736 F.2d at 657.

As an initial matter, the court notes that, in *Lane v. Celotex Corp.*, 782 F.2d 1526 (11th Cir.1986), the Eleventh Circuit expressed grave doubt whether the *Van T. Junkins* rule can be applied to a *witness*, as opposed to a *party*, in a suit, even though the witness may have a similar but unrelated lawsuit pending. The appellate court wrote that, "while a district court

may find that a *party*'s contradictory affidavit constitutes a sham, we would be unable, absent great trepidation, to affirm a similar finding with respect to a disinterested *witness*' contradictory affidavit." 782 F.2d at 1531 (emphasis in original) (citation omitted); *see also Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986) (Hill, J. dissenting) (criticizing majority for holding that a witness's contradictory statements could create an issue of material fact, even though the witness filed a similar suit to the plaintiff and was represented by the same counsel as plaintiff). Notably, the Eleventh Circuit added emphasis to only the word "witness," not the word "disinterested"; moreover, the appellate court apparently viewed the witness as disinterested even though the witness had a similar lawsuit, a circumstance that should have undermined the status of the witness as disinterested. Here, because Thrash is a witness to this proceeding and not a party, the holding of *Van T. Junkins* is arguably not applicable to his statements. His August 2002 affidavit, which states that Sonic told him to fire Israel, therefore, may be enough to create an issue of fact for the jury, even if he made prior contradictory statements; but the court need not rest on *Lane.*

Even assuming that the *Van T. Junkins* rule applies to Thrash's statements, the court holds that Sonic has not demonstrated that Thrash's prior statements in the February 2001 affidavit and the March 2002 complaint necessitate a finding that his August 2002 affidavit "is a sham" intended to create an issue of fact. *Van T. Junkins*, 736 F.2d at 656. First, Thrash's February 2001 affidavit, which was part of Israel's initial administrative complaint with the Equal Employment Opportunity Commission, does not contradict the August 2002 affidavit. In the February 2001 affidavit, Thrash states he was "made to fire" Israel, although it is unclear who told him to do so. This affidavit does not contradict the August 2002 affidavit because in both affidavits he testifies that he was told to fire Israel, and not that he suggested firing Israel. Therefore, the *Van T. Junkins* rule does not apply to the February 2001 and August 2002 affidavits because the two do not conflict.

Sonic next points to a statement in the March 2002 complaint filed in Thrash's own discrimination suit against Sonic. The complaint states that "plaintiff was directed by Robert Jordan, to fire Larry Israel;" Jordan was the Used Car Manager at Friendly Ford. This statement is not enough to compel this court to disregard Thrash's August 2002 affidavit as a matter of law. The court notes that, in *Van T. Junkins,* the Eleventh Circuit was faced with contradictory statements in a different context from the one in the present case. There the issue was whether "a party's affidavit can create an issue of fact when contrasted with the party's deposition." 736 F.2d at 658. In that case, the plaintiff "made [it] crystal clear in three places" that the defendants had not placed a condition on his becoming a dealer of their products. The plaintiff was explicitly asked and "affirmatively stated on deposition that the representatives of A & S did not tell him that he had to buy their company's building in order to become a dealer." *Id.* at 658. Then, plaintiff filed an affidavit in which he swore that the defendant had told him that if he purchased one of their buildings, he would become a dealer. The court held this affidavit could not create an issue of material fact on the question of whether the defendant had told him there was a condition to becoming a dealer in their products, because it contradicted the deposition of the plaintiff, in which he was asked direct questions, and in three places swore to a response contrary to his affidavit. This case is distinguishable from the present situation.

First, the allegedly contradictory statements in this case (in March 2002 and August 2002) were made in two different lawsuits, only one of which was directly focused on Israel's termination. In the March 2002 complaint, Thrash was contesting his own termination from Sonic and was not focusing on Israel's termination, as he was in the August 2002 deposition. In *Van T. Junkins,* the plaintiff made statements in his deposition which demonstrated that there was no issue of fact. The affidavit was submitted in direct response to the deposition, making it easy for the court to conclude that its only purpose was to create an issue of fact, and, therefore, that it was unreliable; this is not the case here, for, while Thrash may be sympathetic to Israel's circumstances, there is no evidence that Thrash has a direct interest, financial or otherwise, in creating a fact issue for Israel. In other words, the factual dispute at the heart of the 2001 affidavit, the 2002 complaint, and the 2002 affidavit, while perhaps helpful to Thrash if resolved in his favor, does not appear to be critical to Thrash's own lawsuit.

Second, the March 2002 complaint was not sworn to by Thrash, nor is it "testimony." Instead, it is a complaint in a lawsuit and was submitted by Thrash's attorney. Thus, the March 2002 statement was not given in response to an "unambiguous" question and, instead, was a general assertion in a lawsuit.

But third, and perhaps most importantly, the court cannot conclude that there is no reasonable possibility that Thrash's statement in the March 2002 complaint cannot be reconciled with his August 2002 affidavit. In both, Thrash says that someone told him to fire Israel, and, though the someone in the two statements is not the same person, it is not inconceivable that both persons told him to fire Israel. This conceivability requires further questioning

of Thrash; it does not warrant rejecting one statement over another as a matter of law.

Finally, with regard to all three statements—the February 2001 affidavit, the March 2002 complaint, and the August 2002 affidavit—it is notable that Thrash, even if inconsistent in one or more respects, was consistent on one important point: that someone else, not he, made the decision to fire Israel. This point is important because it flatly contradicts Sonic's contention that Thrash himself made the decision to terminate Israel.

As a result, Thrash's so-called contradictory statements fall into the category of statements that "create an issue of credibility or go to the weight of the evidence," not those which are "transparent shams." *Tippens v. Celotex Corp.,* 805 F.2d 949 (11th Cir.1986). As the Eleventh Circuit explained in *Tippens,*

"To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness was stating the truth. Variations in a witness's testimony and any other failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact."

805 F.2d 949, 953–4 (11th Cir.1986). The *Tippens* court then went on to narrow the *Van T. Junkins* ruling and stated that "an affidavit may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions' ... and that party attempts 'thereafter to create

such an issue with an affidavit.'" *Id.* at 954; *see also Rollins v. TechSouth, Inc.,* 833 F.2d 1525 (11th Cir.1987) ("We apply this rule sparingly because of the harsh effect this rule may have on a party's case."); *Holley Equip. Co. v. Credit Alliance Corp.,* 821 F.2d 1531 (11th Cir.1987).

In this case, even if Thrash does have discrepancies in his testimony, the court cannot conclude, based on the factors above, that these discrepancies make his August 2002 affidavit a sham, in the sense that it is totally inadmissible as a *matter of law;* though, it is still open to Sonic to argue to the jury that it is a sham as a *matter of fact.* Therefore, the court holds that Israel has successfully created an issue of fact as to whether Sonic's second stated reason for firing Israel (namely, that Thrash convinced them to do so) is credible. Whether Thrash's version of his conversation with Lezon should be believed, or Lezon's version is credible is an issue for the jury, and this court cannot decide it on summary judgment.

Israel has presented "sufficient evidence to create a genuine issue of material fact regarding whether each of [Sonic's] articulated reasons is pretextual," *Chapman,* 229 F.3d 1012, and, therefore, summary judgment cannot be granted.

■ Finally, Sonic argues that this case falls into the category of cases that the Supreme Court addressed in *Reeves v. Sanderson Plumbing Prod., Inc.,* in which the employee has made a prima-facie case of discrimination, and has successfully rebutted the employer's proffered reasons, but still has not presented enough evidence for the factfinder to find that age was a factor in the decision to terminate the employee. 530 U.S. 133, 147–48, 120 S.Ct. 2097, 2108–09, 147 L.Ed.2d 105 (2000). This court disagrees. In *Reeves,* the Court stated that there will be instances when "no rational factfinder could conclude that the action was discriminatory,"

because only a weak prima-facie case was created, or the evidence offered by the plaintiff to contradict the employer's reasons for termination only created a weak issue of fact, or other evidence demonstrated that a nondiscriminatory reason for the employer's decision. *Id.* The court does not believe that this case falls into one of these circumstances.

First, Israel has presented sufficient evidence for a factfinder to conclude that Sonic's proffered reasons for terminating him are false. While this does not lead to the automatic conclusion that Sonic's decision was based on Israel's age, it does create an "inference" that Sonic might be "cover[ing] up a discriminatory purpose." *Id.* at 133, 147, 120 S.Ct. at 2108. Israel offers evidence of a statement made by a member of Sonic's management that he might be too old to change. Sonic argues that this comment, if even made, was not made by the decisionmaker in this case and was in December, three months before Israel was terminated, and, therefore, too far-removed from the decision to fire Israel to be considered evidence of ageism. *See, e.g., Standard v. A.B.E.L. Serv., Inc.,* 161 F.3d 1318 (11th Cir.1998) (holding comment that was heard out of context and not necessarily related to employment of plaintiff was not evidence of discrimination). However, because it is not clear to this court who decided to fire Israel and when that decision was made, the court cannot conclude without more facts that this comment was unrelated to Israel's termination. The comment was made by the National F & I Director of Sonic, who represented the part of management that was directly in control of Israel's department. Additionally, the director's visit to Friendly Ford in December was to introduce its F & I Department to Sonic's work policies. In the context of this visit, while this comment may not necessitate a finding of discrimination, it and other evidence

(in particular, that discussed in the next paragraph) do provide enough from which a reasonable factfinder could find evidence of discrimination; consequently, summary judgment is inappropriate.

Additionally, Israel offers the fact that three managers over the age of 40 at Friendly Ford were fired and replaced by younger employees when Sonic took over. Specifically, Nix, the general manager, who was 49, was replaced by Fogarty, who was 31; Thrash, the sales manager, who was 55 was replaced by Blume, who was 21; and Israel, who was 58 was replaced by Youngblood, who was in his 40s. While this statistical evidence does not by itself prove that Israel was terminated for discriminatory reasons, taken together with the other evidence of discrimination and with the conflicting evidence on who made the decision to fire Israel, a reasonable factfinder could find that this is evidence of discrimination.

### B.

Israel also raises claims against Sonic based on the AADEA. These claims are not addressed by either side in their pleadings, and as this court has previously held, "it is self-evident that the AADEA's purpose and prohibition are like the ADEA's [and] it follows that these principles should govern in AADEA cases as well." *Bonham v. Regions Mortgage, Inc.*, 129 F.Supp.2d 1315 (M.D.Ala.2001) (Thompson, J.).

For the above reasons, it is ORDERED that the motion for summary judgment filed by defendant Sonic–Montgomery FLM, Inc., d/b/a Friendly Ford Lincoln Mercury on June 27, 2002 (doc. no. 21), is denied.